**In the Interest of D.R. and H.R., Children.**

**No. 06–04–00113–CV.**

Court of Appeals of Texas, Texarkana.

Submitted March 23, 2005.

Decided May 26, 2005.

Joe Shumate, Law Office of Joe Shumate, Henderson, for Holli Renfro.

Chad Dean, Law Office of Chad W. Dean, Henderson, for Keith Renfro.

Duke E. Hooten, Department of Family & Protective Services, Austin, for appellee.

Carl H. Barber, for Children D.R. and H.R.

Before MORRISS, C.J., ROSS and CARTER, JJ.

## OPINION

Opinion by Justice ROSS.

Keith Renfro and Holli Renfro appeal from the termination of their parental rights to D. R., a female child, eight years of age at the time of trial, and H. R., a male child, six years of age at the time of trial. In its judgment, the trial court made identical findings to justify termination for each parent as being in the children's best interests, finding that the parent:

> knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger the physical or emotional well-being of the children; and
>
> ... engaged in conduct which endangered the physical or emotional well-being of the children.

Keith and Holli contend in separate briefs that the evidence is legally insufficient to support the termination of their parental rights because it does not support a conclusion that it was in the best interest of either child to have his or her relationship with their parents severed, or to support either of the two stated bases for the termination.

The Texas Supreme Court has set out the following review for us to apply in the context of termination with the application of a clear and convincing evidence standard.

> In a legal sufficiency review, a court should look at all the evidence in the light most favorable to the finding to

determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. This does not mean that a court must disregard all evidence that does not support the finding. Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence.

*In re J.F.C.*, 96 S.W.3d 256, 266 (Tex.2002).

■ If, after we conduct the legal sufficiency review, we determine no reasonable fact-finder could form a firm belief or conviction the matter that must be proven is true, then we must conclude that the evidence is legally insufficient. *Id.*

Keith and Holli had been married since 1997, and had a continuing stormy and often violent relationship. There was evidence Holli was a nude dancer, but little evidence about Keith's employment. Keith testified that Child Protective Services (CPS) became involved with his family in 1997 because of fighting between himself and Holli. The evidence showed that Holli obtained a protective order against Keith and had twice moved into a shelter. The Department of Family and Protective Services (the "Department," and successor to CPS) presented evidence it had been attempting to assist Keith and Holli with parenting skills since 2001, and that Keith and Holli used the children as

pawns in their fights with each other. The children had been removed from the home once, then returned in early 2002 on the recommendation of a clinical psychologist, Robert Jerald Shore, Ph. D., who was providing counseling. The children were removed again in June 2003. The evidence showed that, at that point, both Keith and Holli were using crack cocaine and marihuana. By September 2003, Holli had been arrested on three charges of delivery of methamphetamine.

Shore's tests of Holli showed that she's a "dangerous person with whom to have a relationship." He also testified both parties allowed the children to be in the presence of a known and registered sex offender, Dale Clark (an uncle of the children), and that D.R. exhibited inappropriate sexual behavior and acting out.

Leola Davis, a child protective services specialist, testified that, in May 2003, the family was living with a registered sex offender (Clark) and was using drugs. She testified H.R. had described sexual abuse by Clark. At that point, Keith and Holli voluntarily placed the children with Kendrick Anderson (Keith's brother) and his wife, Melissa. Melissa told Davis that, while the children were with them, for a period of about a month, Keith and Holli visited them briefly perhaps two or three times.

D.R. testified by videotaped interview she liked living in the Anderson home, but did not like living at her mother's house. She stated that her parents were supposed to pick her up at school, but that she often had to walk home when they failed to appear, and that she had to prepare her own food because they did not do so. She stated that her brother, H. R., had told her Clark had touched him in a bad place and that she had seen another individual called "Graveyard," later identified as Albert James Ervin, sexually abuse H.R. She fur-

ther testified "Graveyard" had also had sex with her vaginally, orally, and anally, and that Holli sat on the floor and watched. D.R. stated she had seen them all "smoke dope" and described the use of crack cocaine in a pipe.

H.R. stated by videotaped testimony he liked living at his mother's house. He further stated he had seen his mother having sex with Clark. He also stated Clark had touched him with his "titties" and penis.

In addition to the testimony described above, Keith testified H.R. had been cut with a knife by Holli while Keith and Holli were fighting. Keith also admitted allowing his children to live in the house with Clark, knowing he was a registered sex offender. Keith further admitted he allowed Ervin, who is now in prison, to be at Keith's house, where Ervin had access to the children. Keith blamed Holli for the family's relationship with those individuals. Keith also admitted he regularly used crack cocaine. He spent thirty days in one drug treatment center, but then did not continue the treatment, as was recommended. The evidence shows that Keith had been arrested a number of times: for matters involved with automobile operation, for forgery, and for domestic violence. At the time of this trial, he was brought before the court from the county jail.

Holli was also in jail at the time of this trial. She testified she had been jailed because of drugs, and she invoked her Fifth Amendment privilege against self-incrimination. She had been arrested a number of times over the years and declined to answer a question about how many times she had been arrested. She admitted physical altercations with Keith, but denied he physically abused her; she said any bruises she suffered were the result of his trying to hold her down and calm her. She denied receiving services from CPS when the children were initially removed (except for very brief visits). The Department introduced records of nineteen separate visits to the home, with extensive explanations of its efforts to assist her. Holli testified that she worked as a stripper, but denied that D.R. knew what she did. She admitted using drugs, but also testified she had lied about using drugs when she was placed in a drug rehabilitation program. She denied failing to go to additional therapy recommended by the program counselors.

Holli also admitted she knew Clark was a registered sex offender, but further testified she knew he did not do the acts resulting in his status as a sex offender. She denied having sex with Clark. Holli acknowledged D.R.'s sexual behavior and stated that her problems were the result of having the same genetic problems as herself. She also testified D.R. lies all the time. Holli denied that the children ever went without food and denied that she and Keith had a chaotic lifestyle. In her view, the children had a stable life before CPS "started butting in my business."

Kelly Smith, a counselor who provided therapy for D.R. and H.R., testified the children's play reflected themes of killing, death, and violence, which was consistent with exposure to domestic violence. Smith further testified that D.R. had told her about a great deal of domestic violence, that D.R. had watched sexually explicit material on television with her parents and that D.R. wanted to be a stripper like her mother. Contrary to Holli's testimony that she did not know Smith, Smith testified she and Holli had talked together about a half dozen times. Smith further stated H.R. was behaving in a violent and aggressive fashion at school and on the school bus.

Gail Gulley, the children's guardian, testified she had been unable to contact Holli

and Keith outside the courtroom because they had moved without providing any information.

All of the Department's witnesses testified they believed it would be in the best interests of the children to terminate parental rights.

Some of the evidence before the court was in conflict. The question before this Court is whether the evidence, examined in the light most favorable to the finding, is such as to be legally sufficient to support the verdict. The credibility of the witnesses and their testimony is a matter for the fact-finder, and the evidence contrary to the verdict in this case is not such as to be inherently incredible. As set out above, there is evidence the children were knowingly placed in a home with a sex offender and evidence of extensive family violence over a period of years. There is evidence the children were exposed by both parents to sexual activities and pornography far beyond anything appropriate to their age and evidence of sexually charged behavior by both children reflecting the exposure. There is evidence that both parents regularly used drugs and that they did so in the presence of the children. There is evidence of the mental and emotional instability of Holli and of her predilection to behave violently. There is evidence about extensive arrest records for both parents, as was most clearly shown by the fact that both parents were in jail at the time of this trial.

■■■ The Texas Supreme Court has set out nine nonexclusive factors that a court may consider in determining whether termination is in a child's best interest. They include the child's desires, the child's emotional and physical needs now and in the future, the emotional and physical danger to the child now and in the future, the parenting abilities of the parties seeking custody, the programs available to assist those persons, the plans for the child by the parties seeking custody, the stability of the home or proposed placement, the acts or omissions committed by the parent that may indicate that the existing parent-child relationship is not proper, and any excuse for the acts or omissions committed by the parent. *Holley v. Adams,* 544 S.W.2d 367, 372 (Tex.1976); *In re A.B.,* 125 S.W.3d 769 (Tex.App.-Texarkana 2003, pet. denied).

D.R. stated she wanted to live elsewhere; H.R. stated otherwise. It is clear from the history of the family unit that neither child's emotional or physical needs were being met, and it is equally clear that both children were being severely emotionally damaged by the behavior of their parents, both in their relationship and the parents' apparent indifference to the actions toward their children of the adults with whom they kept company. The programs available had been used with little long-term effect. Because of the incarceration of both parents and the possibility of continued imprisonment, long-term plans would not be possible within the family, and no real alternatives were suggested. The evidence shows serious instability, both physically and emotionally, in the home in the past, and a high probability of such instability in the home in the future. The evidence is legally sufficient to allow a reasonable fact-finder to have formed a firm belief or conviction that its finding was true.

We affirm the judgment.